WALTER S. ARCHIBALD, as Trustee in Bankruptcy of EXCELSIOR BAG AND TENT COMPANY, INC., Appellant, *v.* JOHN PANAGOULOPOULOS, Respondent, Impleaded with Others.

Contract — modification by parol — fact that modification was not reduced to writing immaterial — when loss from depreciation in rate of exchange should be apportioned between parties — when agreement for division of moneys earned attaches to balance of credit established for payment and paid into court under order of interpleader — when lien exempt from prohibitions of Bankruptcy Act — when lien attaches to money overpaid out of said fund to another.

1. Where the findings in an action show that the specifications for articles to be manufactured were to be so changed that such articles would pass under specifications imposed by the original purchaser, a foreign government; that the manufacturer quoted a price for which it would make the article in accordance with these specifications; that its immediate contractor agreed that the material specified and quoted should be used; that it was understood and agreed that a new agreement in writing providing for the use of new material at an increased price was to be prepared and executed, and that such agreement was prepared but not executed, and the articles were thereafter manufactured and delivered in accordance with this arrangement, such facts clearly show a full and complete modification of the original agreement and the parties having made such an agreement and subsequently executed it, it is immaterial that it was not reduced to writing as was proposed. The subcontractor, therefore, is entitled to receive the increased price for the article manufactured.

2. Where for the purpose of paying for the articles when manufactured and delivered a credit in foreign money had been established, payable to the manufacturer from time to time as deliveries were made, a certain percentage of which payments said manufacturer as subcontractor had agreed to pay over to his immediate contractor, and a depreciation in the rate of exchange occurred, occasioning a loss for which neither the manufacturer nor his immediate contractor was responsible and for which the contract did not provide, the item of depreciation should be apportioned between the two parties in proportion to the amount of their respective shares as finally fixed in the original sum.

3. Where in an action by the subcontractor against the depositary of the fund to recover a balance thereof, said balance has been pa'd into court and the plaintiff's immediate contractor and another have been interpleaded as parties defendant, and a fair and justifiable interpretation of the contract in the light of all the surrounding circumstances and of the acts of the parties is that it was an agreement for a division of the fund which the manufacturer was to receive in the first instance, and then pay to its immediate contractor a certain portion thereof, the agreement attached to the fund paid into court and created a lien upon it in the latter's favor to the extent of the amount due him, and when such interest or lien antedates by more than four months the date of bankruptcy proceedings instituted against the plaintiff it is exempt from the prohibitions contained in the Bankruptcy Act (§ 67, subd. f).

4. Where moneys overpaid to one of the interpleaded defendants and by the judgment in this action directed to be repaid came from the fund placed to the credit of the subcontractor which in part should have been paid to the immediate contractor to the knowledge of said interpleaded defendant, the latter took subject to said contractor's rights, and he is entitled to have the moneys so adjudged to be repaid devoted, if necessary, to the satisfaction of his claim.

*Archibald* v. *Panagoulopoulos,* 192 App. Div. 935, reversed.

(Argued April 19, 1922; decided May 31, 1922.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered June 16, 1920, modifying and affirming as modified a judgment in favor of defendant entered upon a decision of the court on trial at Special Term.

*Charles B. Sullivan* for appellant. The allowance of a commission to Panagoulopoulos at the rate of fifty-one cents per tent for 150,000 tents is erroneous as a matter of law upon the findings. (*Bonnell* v. *Griswold,* 89 N. Y. 122; *Israel* v. *Manhattan Ry. Co.,* 158 N. Y. 624; *Parsons* v. *Parker,* 159 N. Y. 16; *Johnson Service* v. *Hildebrand,* 149 App. Div. 680; *Harris* v. *Shorall,* 230 N. Y. 343.) As a matter of law the shrinkage of the moneys paid by the express company to an average of two dollars and

forty-seven cents per tent is not chargeable to plaintiff, and Panagoulopoulos in no event should be credited any commission against plaintiff based on two dollars and fifty-four cents per tent which is seven cents more per tent than plaintiff ever received. (*Whalen* v. *Stuart*, 194 N. Y. 495; *Barcalo Mfg. Co.* v. *Maltonado. & Co.*, 221 N. Y. 499; *Kinney* v. *Kinney*, 221 N. Y. 133; *Olin* v. *Kingsbury*, 181 App. Div. 348; 5 Wait's N. Y. Pr. 4481; *MacArdell* v. *Olcott*, 189 N. Y. 372; *Langdon* v. *Northwestern Mut. Life Ins. Co.*, 199 N. Y. 205.) The decision and judgment is erroneous in decreeing and adjudging the moneys in court to be the " property," of Panagoulopoulos and directing payment of the specific moneys to him. (*Hanna* v. *Stedman*, 230 N. Y. 326; *N. Y. Life Ins. Co.* v. *Dunlevy*, 241 U. S. 518; Code Civ. Pro. § 500; *Truesdell* v. *Sarles*, 104 N. Y. 164; *Southwick* v. *First Nat. Bank*, 84 N. Y. 420; *McNeil* v. *Cobb*, 186 App. Div. 177; *Graham* v. *Read*, 57 N. Y. 681; *Nat. Bank* v. *Lack. Trans. Co.*, 59 App. Div. 270.)

*Frederick N. Van Zandt, Fred L. Gross* and *Frederick A. Keck* for respondent. The bankruptcy of the Excelsior Bag & Tent Company, Inc., subsequent to the entry of the judgment, is no ground for reversing or modifying the judgment. (*Cook* v. *Tullis*, 85 U. S. 341; *Erie R. R. Co.* v. *Dial*, 140 Fed. Rep. 689; *Melen* v. *Athens Hotel Co.*, 149 App. Div. 534; *Vandewater* v. *Mutual R. L. I. Co.*, 44 Misc. Rep. 316; *Dinlay* v. *McCullagh*, 92 Hun, 454; *Windecker* v. *Mutual L. I. Co.*, 12 App. Div. 73; *Hirsh* v. *Mayer*, 165 N. Y. 236.)

HISCOCK, Ch. J. This appeal deals with questions springing out of a Servian war contract made in the fall of 1914 and it portrays in an interesting manner the way in which such a contract was loaded with tribute to speculators and profit seekers before it engaged any individual who expected really to earn compensation by

any actual production. It is necessary to state with considerable detail the history of the transaction in order to furnish a basis for an intelligent discussion of the questions which are now presented to us.

The Servian government desired to procure 150,000 shelter tents with accessories, made according to detailed specifications. One Galatti entered into a contract to furnish them at a price of 15 francs a tent and which is assumed at that time to have been the equivalent of $3 American money. Galatti manifestly had no ability or intention to manufacture the tents but only to devise some arrangement which would enable him to obtain part of the money which the government was to pay. He thereafter made a contract with one George Panagoulopoulos under and by which the latter was to manufacture and supply them at a price of $2.55 each. Down to this point the transactions had taken place in Servia. But Panagoulopoulos was the same kind of a tent manufacturer as Galatti and, therefore, his efforts were devoted to finding some one who would furnish the tents which he had agreed to supply at a price low enough so that he would be able to retain by way of his profits part of the price which the government would pay. The result of this ambition was that through his brother, the respondent, John Panagoulopoulos, he finally made a contract with one Bartle by which the latter was to furnish the tents directly to the Servian government, collect from it the entire original contract price of $3 a tent and " remit to Panagoulopoulos $.51 for each tent shipped as remittances were received " and pay to Galatti the balance of $3 a tent over and above $2.54. One of the questions later to be discussed is whether the price to be received by Bartle was not materially increased as between him and Panagoulopoulos.

While Bartle undoubtedly entered into this contract with the expectation or hope of really manufacturing the

tents, these seem to have been based largely on facilities for so doing thereafter to be acquired rather than upon any possessed at the time he entered into the contract. To the end of securing such facilities he thereafter caused to be incorporated the Excelsior Bag and Tent Company which assumed and took over his obligations and contracts above referred to and under the name of said company he entered into an agreement with the defendants Otis and others, comprising the copartnership of Otis & Company under which the latter were to furnish financial aid in carrying out said contracts for a consideration of $.15 on each tent and as security for such payment were to receive an assignment of $1.37 out of the price received for each tent. Thus it finally came about that the one who was actually to manufacture and furnish the tents was to receive for each tent $1.88 out of $3 which the government was to pay therefor.

For obvious reasons Bartle did not desire to ship the tents which he might manufacture until some arrangement had been made guaranteeing the payment therefor. Originally the plan between Bartle and Panagoulopoulos seems to have been that the Irving National Bank of New York should guarantee performance by the former of his contract and on the other hand should make payment for each shipment on presentation of invoices and bills of lading. For some reason not disclosed or material, the American Express Company was substituted in the place of the Irving National Bank and ultimately there was established with it by the Servian government through the National Bank of Greece an irrevocable credit in the name of the Excelsior Bag and Tent Company of 13 francs and 25 centimes for each tent and which credit and arrangement were accepted by Bartle and Otis & Company and thereafter drawn against by the former. The reduction in this credit from 15 francs to 13 francs and 25 centimes a tent seems to have been through some arrangement by which the original con-

tractor, Galatti, divested himself of all right in the moneys to be paid.

The Excelsior Bag and Tent Company acquired all of Bartle's right and assumed all of his obligations. It fulfilled its contract and manufactured and delivered the tents and collected all of the moneys deposited with the American Express Company as above set forth, except the sum of $20,338.52 which has become one of the subjects of this litigation. The moneys which it thus collected, either directly or through Otis & Company as its assignee, were in large part paid to the latter, under an agreement by which it was to account for the same when the contract was closed, and out of said moneys there were not paid to Panagoulopoulos the sums agreed by Bartle to be paid to him.

I now go back to the question of the compensation which Bartle under his contract with Panagoulopoulos was to receive for manufacturing the tents. As stated, this compensation was originally fixed at $2.03 a tent. But at the time this arrangement was made the parties apparently were not fully advised of the specifications which had been fixed by the Servian government and it was later ascertained that tents manufactured in accordance with the specifications originally fixed by Bartle and Panagoulopoulos would not be accepted by the Servian government under its contract which was the basis throughout of all of the subsequent contracts and arrangements which have been referred to. Dealing with this situation it was found by the trial court in response to requests made by the Tent Company, the original plaintiff, " That thereafter (that is, after the original contract had been made) Bartle and Panagoulopoulos found that the army commercial cloth (specified in such original contract) would not be accepted by the Servian Government and Bartle quoted Panagoulopoulos a price of $2.35 for the low count shelter cloth, fabric, 52–56, Specification No. 640, and Panagoulopoulos agreed that such cloth should

be used; a sample of such cloth procured by Bartle from the United States Armory at Troy, N. Y., was submitted to Panagoulopoulos and accepted by him.   *   *   *

" That it was understood and agreed between Bartle and Panagoulopoulos that a new agreement in writing providing for the use of low count army shelter cloth at $2.35 per tent for said 150,000 tents was to be prepared by Bartle and executed by both, that such agreement in form was prepared by Bartle and left with Panagoulopoulos for approval and signature but the same was never signed by the parties," and, " thereupon with the knowledge and approval of Panagoulopoulos, Bartle began at once the manufacture of such tents."

After the contracts had been performed by the Tent Company it brought an action to recover from the Express Company the balance of $20,338.52 still remaining in its possession under the contracts and for the purposes hereinbefore stated. At the same time the respondent, John Panagoulopoulos, to whom had been transferred all the rights of his brother, George, through the foregoing transactions, and Otis & Company were also making claims to the same moneys. Under these circumstances the Express Company obtained an order providing that it pay the moneys into court and that Otis & Company and Panagoulopoulos be substituted in its place as defendants in the action which had been brought and that the plaintiff in such action be permitted to file a supplemental complaint setting forth its claims to said moneys. It filed such supplemental complaint setting forth some of the facts hereinbefore detailed and claiming that it was entitled to said money; and demanding judgment first, that it be adjudged that it " is the owner of and entitled to moneys so paid into court " and that " none of said defendants has any interest therein and for the costs of this action." It also sought an adjudication of claims made against it by Panagoulopoulos springing out of other transactions and outside of the moneys so held

by the Express Company as aforesaid. Panagoulopoulos served an answer in which he claimed that he " was and is now the owner of and entitled to the possession of the sum of $20,338.52," which had been paid into court; and he demanded judgment that he was entitled to said moneys and that his claim was " prior and superior to the claim of any other person thereto." He also sought an adjudication upon his alleged claim outside of such moneys against the plaintiff. Otis & Company served an answer setting forth its contract and arrangements with plaintiff, claiming that the latter was still indebted to it over and above all sums collected in an amount of $14,639.54 and for which sum it demanded judgment against plaintiff.

Under these circumstances the case coming on for trial the court found the foregoing facts among others which it is unnecessary to state and reached the conclusion that the respondent Panagoulopoulos was entited to the fund paid into court by the Express Company as above stated; that he was entitled to judgment for the sum of $7,538.30, which was the balance due from Otis & Company after crediting it on account of the sums paid to it by or for the Tent Company with all legal and proper credits and that he also should have judgment against the Tent Company for the sum of $31,457.82 as a balance due him under his contract after crediting the Tent Company with the moneys paid into court, the sum to be paid by Otis & Company and various other disbursements chargeable to Panagoulopoulos. In awarding this relief to said defendant and respondent the court only allowed the Tent Company the original contract price of $2.03 per tent and not the alleged modified price of $2.35 which has been referred to, and also charged it with the full amount originally placed to its credit without any allowance for depreciation in the value of the Servian francs.

Within four months after Panagoulopoulos obtained his judgment against the Tent Company the plaintiff was

appointed its receiver in bankruptcy and thereafter was substituted in its stead in this litigation.

Upon this necessarily long statement of complicated fact we come to the discussion of four questions involved in the judgments below and mainly argued upon this appeal.

*First.* As has been stated, the courts below have allowed the Tent Company only $2.03 per tent as the price which it was to receive under its contract with Panagoulopolos. We think that this was error and that it should have been allowed $2.35 for each tent in accordance with the findings made in response to its requests and which have already been quoted at sufficient length. Those findings show that the specifications of the contract made by the Tent Company were to be so changed that the tents would pass under the specifications imposed by the Servian government; that the Tent Company " quoted " a price for which it would make the tents in accordance with these modified specifications; that Panagoulopoulos " agreed " that the cloth so specified and quoted should be used; that it was understood and agreed that a new agreement in writing providing for the use of new material at $2.35 was to be prepared and executed and that such agreement was prepared but not executed and tents were thereafter manufactured and delivered in accordance with this arrangement. These facts seem to us clearly to show a full and complete modification of the original agreement and the parties having made such an agreement and subsequently executed it, it is immaterial that it was not reduced to writing as was proposed.

*Second.* The courts below, in effect, have charged the Tent Company with the entire depreciation which the Servian francs suffered between the time when the credit was established with the Express Company and the dates when actual payments were made to the Tent Company. Under the original contracts the aggregate of the sums to be paid to it and to Panagoulopoulos was $2.54 a tent and it seems to be assumed that the credit of thirteen

francs and twenty-five centimes originally established was at that time more than sufficient to pay this sum. The depreciation in exchange was such, however, that in the end there was realized, including the moneys paid into court, only the sum of $2.47 a tent. Notwithstanding this fact the courts have charged the Tent Company with the original sum of $2.54 a tent, thus making it stand the depreciation of seven cents on each tent.

We see no justification for doing this. While under the contracts originally made between the Tent Company, Panagoulopoulos and Galatti, the first named party in terms literally agreed absolutely to pay Panagoulopoulos 51 cents a tent, a fair interpretation of all the instruments indicates that the real intent and understanding of the parties were that out of every $2.54 received from the Servian government the Tent Company should receive $2.03 (as originally fixed) and Panagoulopoulos through remittances from the Tent Company 51 cents and Galatti the balance between that aggregate and the sum actually collected from the Servian government. Panagoulopoulos, of course, knew about the credit which was established for the benefit of the Tent Company with the Express Company and so far as we can discover he entered no objection to the amount of that credit which was then sufficient to take care of both himself and the Tent Company. In fact, Bartle and the Tent Company were the ones who were contending for the establishment of an irrevocable credit which would seem to be sufficient to meet the demands of all parties. Under these circumstances what has happened in the way of depreciation of Servian money seems to have been a contingency for which neither party was responsible and for which the contracts did not provide. This view leads us to the conclusion that the item of depreciation should be apportioned between the Tent Company and Panagoulopoulos in proportion to the amount of their respective shares as finally fixed in the original sum of $2.54.

*Third.* The remaining question is closer and more difficult. It is the one whether Panagoulopoulos under his contract with Bartle acquired such an equitable interest in or lien upon the fund paid into court under interpleader proceedings as entitles him to a judgment awarding any part of said sum to him in satisfaction of his claims. If he did acquire such interest or lien it antedates by more than four months the date of the bankruptcy proceedings instituted against the Tent Company and is, therefore, exempt from the prohibitions contained in the Bankruptcy Act (sec. 67, subd. f). (*Root Mfg. Co.* v. *Johnson,* 219 Fed. Rep. 397.)

With some hesitation we have reached the conclusion that he did acquire such an equitable interest or lien. The fund which has been paid into court under the interpleader proceedings which have been heretofore summarized, was part of an irrevocable credit which was established with the Express Company in the name of the Tent Company for the express purpose of paying for the tents. The Tent Company was entitled to and did draw upon this fund as rapidly as the tents were manufactured and certain conditions complied with and the amount now in court is the conceded balance of said fund which is to be applied to the payment for said tents. Under the contract between Panagoulopoulos and Bartle the latter said: " I am to receive as agreed the price of $2.03 each (tent), I hereby agree that as remittances are received by me for each shipment I will remit to you to such address as you will require an amount equal to $.51 for each * * * tent * * * I further agree at the same time to remit either to Galatti in Athens or his partner * * * the difference between $2.54 and the price I receive from the Servian Government." Under this agreement Bartle literally agreed to pay Panagoulopoulos 51 cents a tent, and it was a personal agreement outside of the fund. Such an interpretation of an absolute liability, however, would not be at all in

accordance with the position assumed by the appellant at various points on this appeal and we think that a fair and justifiable interpretation of the contract in the light of all the surrounding circumstances and of the acts of the parties is that it was an agreement for the division of the fund which was to be received in the first instance by the Tent Company and under which it was agreed that Panagoulopoulos should receive a certain portion of the fund. It would be foreign to the appellant's general attitude to interpret the agreement as imposing a personal liability upon Bartle to pay a certain amount to Panagoulopoulos independent of the fund which was paid to him or as meaning anything else than that the rights of Panagoulopoulos were limited to a share of the fund which was to be collected for the tents.

Under these circumstances we think that the agreement attached to the fund now in court and creates a lien upon it in favor of Panagoulopoulos to the extent of the amount due him. (*Barnes* v. *Alexander*, 232 U. S. 117; *Williams* v. *Ingersoll*, 89 N. Y. 508; *Harwood* v. *La Grange*, 137 id. 538.)

*Fourth.* The considerations just stated leading us to the conclusion that Panagoulopoulos had an equitable interest in or lien upon the fund paid into court lead to the further conclusion that he has a similar interest in or lien upon the moneys directed to be repaid by Otis & Co. if necessary to satisfy his claims. The moneys paid to that firm came from the fund placed to the credit of the Tent Company with the Express Company and in part they should have been paid to Panagoulopoulos instead of to Otis & Co. The latter knew of the rights of Panagoulopoulos under his contract with the Tent Company and, therefore, took subject to the same. Under these circumstances Panagoulopoulos would be entitled to have the moneys now adjudged to be repaid by Otis & Co. devoted, if necessary, to the satisfaction of his claims. As a matter of fact, this proposition on the

present aspect of the case seems to be an academic one. If on a new trial the rights of the respective parties should be fixed as indicated by our opinion, the fund now paid into court will be more than sufficient to satisfy the rights of Panagoulopoulos without resort to the moneys repaid by Otis &. Co. and in that contingency they would be paid to the plaintiff as the trustee of the Tent Company.

The judgments should be reversed and a new trial granted, with costs to abide the event.

HOGAN, CARDOZO, POUND, McLAUGHLIN, CRANE and ANDREWS, JJ., concur.

Judgments reversed, etc.