**CONEY ISLAND RESORTS, INC., Plaintiff,**

v.

**Rudolph GIULIANI, individually and as Mayor of the City of New York, and The City of New York, Defendants.**

**No. 00 CV 2233(ILG).**

United States District Court, E.D. New York.

July 13, 2000.

Leopold Kaplan, New York City, for Plaintiff.

Susan M. Shapiro, Corporation Counsel of the City of New York, New York City, for Defendants.

## MEMORANDUM and ORDER

GLASSER, District Judge.

This action is before the Court on the defendants' motion for summary judgment, arising out of earlier proceedings on the plaintiff's application for declaratory and injunctive relief, decided against it for reasons set forth in a memorandum and order dated May 10, 2000, familiarity with which is assumed. *See Coney Island Resorts, Inc. v. Giuliani,* No. 00–CV–2233, 2000

WL 804636 (E.D.N.Y. May 10, 2000). For the reasons that follow, the defendants' motion is granted, and the Complaint is dismissed.

## BACKGROUND

Both the relevant factual background, and the parties' legal contentions have been supplemented by submissions from the parties, and by arguments made before the Court since the proceedings on plaintiff's earlier application. Thus, at the risk of some repetition of findings already made in the memorandum and order of May 10, a new and fully consolidated statement of that background, and of those arguments, follows.

The relationship between the plaintiff, Coney Island Resorts, Inc. ("CIR"), and the City began with a Request for Proposals in 1984 by the Parks Department, aimed at stimulating economic development in the Coney Island area of Brooklyn.[1] Plaintiff responded with a proposal to develop an amusement park on Steeplechase Park and Steeplechase Pier, and in response, the City entered into a license agreement with plaintiff, permitting it to operate such a park on City-owned property in the area.[2] Of Significance to the factual issues on this motion is a provision of the license agreement concerning CIR's obligation to obtain project financing:

> This License is conditioned upon Licensee [i.e., CIR] securing a loan, syndication, cash, offering or other financing (in form and substance reasonably satisfactory to City) in an aggregate gross amount of not less than Three Million Dollars. . . .

Bullard Aff., Exh. A at ¶ 6.

In early 1986, CIR began talking with the New York City Public Development Corporation (the "PDC"), hoping to obtain its assistance in the development of the

---

**1.** In conjunction with its proposal, CIR posted a $10,000 "bid bond" with the Parks Department.

**2.** CIR posted a $25,000 security deposit with the Parks Department at the time it executed the license agreement.

contemplated amusement park. On October 30, 1986, CIR, the PDC, and the Parks Department issued a letter of intent, describing a $70 million, three-phase project to develop an amusement park on a single site to be composed of the City-owned Steeplechase properties, and certain contiguous properties to be purchased, or already purchased by CIR. The letter states:

> The Developer [i.e., CIR] will submit to PDC and Parks, within 180 days after the execution of this letter, binding financial commitments, satisfactory to PDC and Parks, to develop, as applicable, the Initially Complete Project as described [elsewhere in the letter of intent]. PDC and Parks may require the Developer's binding financial commitments to be sufficient to take into account the possibility of operating losses during the first years of the Project. What shall constitute sufficient financing to allow for such operating losses shall be determined by PDC and Parks in the reasonable exercise of their discretion.

Brown Aff., Exh. A at 9–10.

From the outset, CIR encountered obstacles to the procurement of financing, and from the outset, PDC and the City evinced a willingness to work with CIR in overcoming those obstacles. Thus, when the letter of intent deadline for obtaining financing—May 1, 1987—came and went, PDC extended it to October 1, 1987. Brown Aff., Exh. B. The PDC and the Parks Department also cooperated actively in efforts to secure certain preliminary legislative and municipal clearances for the project. In conjunction with efforts to convert the Steeplechase Park site into "mapped parkland," the City lobbied for, and obtained legislation from the New York State Legislature authorizing the leasing of such parkland, with specific reference to Steeplechase Park, CIR, and the contemplated transaction between CIR, the PDC, and the Parks Department. *See* Act of Sept. 1, 1988, ch. 632, 1988 N.Y.Laws 1231.

During several months of 1988, CIR engaged in some initially promising talks about financing with Security Pacific National Bank, in the light of which the outlines of the contemplated project became more expansive and ambitious. That initial promise faded by early 1989, however, when Security Pacific withdrew from talks, never to return. Nevertheless, when the Board of Estimate authorized the City to enter into a long-term lease with CIR of City-owned property in Steeplechase Park for the purpose of developing an amusement park, it was the more ambitious plan formulated in collaboration with Security Pacific that was envisioned in its Resolution. *See* Bd. of Estimate Resolution, Cal. No. 21, May 23, 1989 (attached to Brown Aff., Exh B.). The Resolution recapitulates in some detail the material terms of the development leases that had been previously worked out between CIR and the City concerning the City-owned property, and two contiguous CIR-owned properties in the Steeplechase area. The Resolution concludes:

> RESOLVED, That the terms and conditions of the Development Leases and other legal instruments as hereinbefore stated are satisfactory, and that the Mayor, or Deputy Mayor, the Commissioner of Parks and Recreation and the Commissioner or Deputy Commissioner of General Services, as appropriate, are authorized to execute and deliver the instruments herein described and other instruments which may include such provisions, consistent with such terms and conditions, as the applicable above-named official shall determine to be necessary, appropriate or desirable to effect the transactions herein authorized and the Project herein described, provided that such instruments are approved as to form by Corporation Counsel and that the same are executed and delivered within 18 months after the date of this resolution, provided that such time may be extended for up to three years from

the date of this resolution on account of litigation.

*Id.* at 7.

By November, 1990, CIR and the City had substantially concluded negotiating the terms of the lease referred to in the Board of Estimate Resolution, and the City delivered a draft copy of such a lease to CIR. At that point, however, CIR had not succeeded in procuring financing for the development project satisfactory to the City in form and amount, and in a letter to CIR President Horace Bullard, dated November 22, 1990, the City, by Deputy Mayor Sally Hernandez–Piñero, signified as much:

> This letter confirms that the undersigned have concluded negotiating in material respects a ground lease between The City of New York ..., as Landlord, and Coney Island Resorts, Inc...., as Tenant, for the project known as the Steeplechase Amusement Park. The procurement of financing by CIR in form and amount satisfactory to the City remains as one of the conditions to execution and delivery of such ground lease.

Brown Aff., Exh. C. In the same letter, the City extended the deadline for execution and delivery of a lease to November 25, 1991, and also imposed monthly payment obligations on CIR, in consideration of that extension, amounting to $5,000 for each month that passed without execution and delivery of the lease. *Id.*

A year later the parties were in essentially the same situation: waiting for the procurement of satisfactory financing. Once again, this was reflected in a letter from the Ms. Hernandez–Piñero to CIR's Bullard, dated November 25, 1991, granting another extension for execution and delivery of the lease, this time to May 25, 1992:

> This letter reconfirms that the undersigned [namely, CIR and the City] have concluded negotiating in material respects a ground lease between the City of New York ... and [CIR] ... for the project known as Steeplechase Amusement Park. The procurement of financing by CIR in form and amount satisfactory to the City continues to remain as one of the conditions to execution and delivery of such ground lease.

Brown Aff., Exh. D. The November 25, 1991 letter continued the monthly payment obligation of $5,000 per month, in consideration of the extension. *Id.* The letter also made reference to a joint venture CIR was contemplating with an enterprise called Triple Five, Inc., and stated that if CIR failed within 60 days to produce evidence that it had entered into an agreement with Triple Five consummating that joint venture, it must pay the Economic Development Corporation (the corporate successor to the PDC) an additional $10,000 per month as of January 30, 1992, until execution and delivery of the lease. *Id.* The November 25, 1991 letter also provided that CIR "shall furnish to EDC within 60 days from the date hereof copies of bank letters of interest from institutional lender(s) and/or letters of interest from prospective equity investors for construction and permanent financing for the Steeplechase project in an amount not less than $200 million." *Id.* Finally, the letter imposed on CIR responsibility for emergency repairs to the Coney Island Pier, as well as liability for two penalty payments of $10,000 each if the repairs were not complete within 120 days. *Id.*

On May 22, 1992, the City granted another extension to CIR, to June 26, 1992, in consideration of an extension payment of $20,000. Brown Aff., Exh. E. On June 25, 1992, another extension was forthcoming, to July 27, 1992, in consideration of another $20,000. Brown Aff., Exh. F. On July 27, 1992, a final extension was granted, to September 25, 1992, once more in consideration of a $20,000 extension payment. Brown Aff., Exh. G. These three letters contain substantially identical wording. They each refer to extending "the time for execution and delivery of the Ground Lease specified in the Board of

Estimate Resolution approved on May 23, 1989." They each identify a payment of $20,000 as a "condition of this extension." They each state that "in the event either CIR has failed to make the required payment by [the specified extension date] or has not executed or delivered the Ground Lease by [that date], CIR shall have no authority, right, designation or interest of any kind with respect to the City-owned project parcels." Finally, each letter continues "CIR's rights and obligations under the license agreement between CIR and [the Parks Department], dated April 1, 1985." Brown Aff., Exhs. E, F, & G.

On September 22, 1992, Mr. Bullard signed the draft lease that had been provided to him in November, 1990, and on September 24 he delivered the signed draft lease to EDC, together with a check for $20,000. Mr. Bullard also wrote a letter, addressed to Deputy Mayor Barry F. Sullivan, which accompanied the lease and the check. In that letter, Mr. Bullard noted that he was taking this action "in order to protect the legal rights of the development package." Brown Aff., Exh. J. He also observed:

> I am submitting this signed document reluctantly, Because [sic] the City of New York has failed to extend the deadline date (September 25, 1992) for the delivery of the "Ground Lease". We would have much prefer [sic] to receive an appropriate extension of the deadline imposed by the City.

*Id.*

In its papers and in oral argument on its application for injunctive relief held on May 1, 2000, CIR urged that seen in the context of the extensive negotiations held beforehand, Mr. Bullard's signature and delivery of the draft lease operated to create a valid and enforceable lease. This theory was discussed and rejected in this Court's memorandum and opinion of May 10, 2000, but that discussion need not be recapitulated here, because in oral argument on July 7, 2000, CIR abandoned the argument, in favor of a new gambit. CIR

now concedes that no lease was ever created. Rather, CIR argues that the City breached a valid and enforceable contract to enter into a lease, and by its conduct since the breach, has abridged CIR's protected property interests, and thereby has violated its rights under the Due Process, Contract, Takings, and Equal Protection Clauses of the Constitution.

The City maintains that CIR did not fully satisfy its payment obligations under the extension letters. *See* Balder Second Supp. Reply Aff. at ¶ 10–14. Nevertheless, the City does not dispute that CIR did pay more than $148,000 for extensions of the deadline set forth in the Board of Estimate Resolution. *Id.*

Although the record reflects that the City gave some consideration to granting CIR additional extensions to obtain financing for the Steeplechase Project, there is no dispute that no such extension was actually forthcoming. *See* Brown Aff. at ¶ 34, Exh. I. Thus, on March 8, 1994, Deputy Mayor John Dyson wrote to Mr. Bullard to inform him that the City was finally terminating negotiations with CIR concerning the lease, effective in 10 days. Brown Aff., Exh. H.

In response, Mr. Bullard wrote a letter to Mr. Dyson, stating that the City's attempt to terminate negotiations was in violation of a two-year extension granted by the City on September 25, 1992. Brown Aff., Exh. N. Mr. Bullard also claimed that he had by now secured financing commitments from Donaldson, Lufkin & Jenrette and Fuji Bank, and urged the City to reconsider its termination decision. *Id.* In response, EDC Vice–President Angela Brown wrote to Mr. Bullard, in a letter dated April 6, 1994, that the City had no record of having granted an extension to CIR beyond September 25, 1992, and that in any event, the City "remains unconvinced that CIR has or will be able to procure a financing commitment from a potential source of construction and/or permanent loan financing any time soon."

Brown Aff., Exh. O. Accordingly, Ms. Brown concluded, the City would not reconsider its decision to terminate discussions about the Steeplechase project with CIR. *Id.*

On April 4, 1994, the Parks Department, by a letter from Joanne Imohiosen of the Commissioner's Office, terminated CIR's license to the City-owned Steeplechase Park properties, effective April 15, 1994. Ms. Imohiosen's letter cited CIR's failure to proceed with repairs of the Coney Island Pier, about which CIR had been on notice since November, 1991. Balder Reply Aff. on Cross–Motion to Dismiss, Exh. A. Indeed, CIR had made two extension payments to the Parks Department, as a penalty for having failed to make the required repairs, and pursuant to the terms of the November 25, 1991 extension letter. *See* Brown Aff., Exh. D, Bullard Second Supp. Reply Aff., ¶¶ 10, 14. Ms. Imohiosen's letter also makes reference to a letter from the Parks Department to CIR, dated December 29, 1992, instructing CIR to proceed with the overdue repairs and submit documentation of having done so within 20 days. There is no evidence in the record to contravene Ms. Imohiosen's representation that CIR never made the repairs, and in these proceedings, CIR has not contested the lawfulness of the City's actions in terminating its license, or its authority to have done so.[3]

In March 1994, CIR did file an order to show cause in Supreme Court, New York County, seeking an order pursuant to Article 78 of the CPLR requiring the City to withdraw the Dyson termination letter, and to deliver a fully executed ground lease for Steeplechase Park to CIR. On April 11, 1994, Justice Arber orally denied CIR's application for a temporary restraining order, and refused to sign an order to show cause, which oral order was affirmed and explained by a written Decision and Order, dated May 11, 1994. Balder Aff., Exh. C.[4]

For about three years, matters between CIR and the City lay dormant. In 1997 and 1998, at CIR's prompting, the City conducted several meetings with CIR and various representatives of CIR. CIR has submitted affidavits from four of its agents or partners involved in those meetings, variously attesting to CIR's understanding at the time that the City intended to continue working with CIR to realize the Steeplechase Park project. The affidavits make plain that CIR was still actively soliciting potential partners for the amusement park project. They show that EDC was still willing at least to listen to CIR, when CIR requested a meeting for the purpose of presenting ideas or proposals to it. They also show that the Mayor's office held preliminary discussions with CIR about involving CIR in the newly envisioned project for Steeplechase Park, namely, building a minor league baseball stadium. What they do not show is that the City ever reconsidered its March, 1994

---

**3.** In losing its license, CIR also forfeited its $10,000 bid bond, and a $25,000 security deposit.

**4.** Although in its Memorandum and Order of May 10, 2000, this Court referred to the Article 78 action as "pending," the record has now been supplemented to make clear that because Justice Arber never signed the initial order to show cause, CIR never validly commenced its Article 78 proceeding. After Justice Arber's determination, CIR did nothing, effectively abandoning its action (which is marked in the records of the Office of Court Administration in Supreme Court of New York County as "disposed"). Shapiro Dec., Exh. G; *see also Matter of Fry v. Village of Tarrytown,* 89 N.Y.2d 714, 717, 658 N.Y.S.2d 205, 680 N.E.2d 578 (1997) ("Since an unexecuted order to show cause is of no legal effect, its filing did not satisfy the provision of the commencement-by-filing statute requiring petitioner to file an order to show cause or a notice of petition along with the petition."); *Matter of Gershel v. Porr,* 89 N.Y.2d 327, 332, 653 N.Y.S.2d 82, 675 N.E.2d 836 (1996) (where putative Article 78 petitioner had withdrawn his order to show cause, and Supreme Court had marked the proceeding as "dismissed," the Article 78 proceeding "was effectively abandoned because there was then no viable order to show cause or notice of petition in the file").

decision to terminate negotiations with CIR over the lease, or did anything to revive any commitment the City might still have been bound by in March, 1994. Indeed, the affidavits suggest to the contrary that CIR, when apprised of the City's plan to build a baseball stadium, immediately attempted to collaborate, suggesting a site other than the City-owned property in Steeplechase Park. *See* Scheffer Aff. at ¶ 8. The City entertained CIR's suggestion, although from the outset also made clear that if CIR was again unable to procure financing, the City would proceed without CIR. *Id.* at ¶ 10. Talks continued off and on for over a year, and CIR made several presentations to designees of the Mayor, hoping to persuade the City to work in conjunction with CIR on the development of the stadium. Significantly, on the account of CIR's own consultant, a sticking point appears to have been the fact that, although CIR did own certain contiguous parcels, it did not have a lease on the City-owned property in Steeplechase Park. *Id.* at ¶ 20. This fact was a matter of particular concern to CIR's development partners, New Roc Associates, which worried "that in order to obtain permanent bank financing for the project, the City would have to activate CIR lease." *Id.* In turn, New Roc was told by former EDC President Charles Millard "that he could not comment on, or activate CIR's lease, without the expressed permission of the Mayor, as this project was out of the hands of EDC, and under the control of the Mayor." *Id.*

Unfortunately for CIR, that permission was never forthcoming. The preliminary talks fell through, and the City proceeded on the baseball stadium without CIR. In January, 1999, Mayor Giuliani highlighted the stadium in his State of the City message. And, on April 12, 2000, the New York City Council voted to approve zoning changes necessary for the development of City-owned property in Steeplechase Park into a minor league baseball stadium. The City presently intends the stadium to be ready for baseball in June, 2001.

## DISCUSSION

The standards governing a motion for summary judgment are familiar. Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir.1988). The court's function in ruling on a motion for summary judgment is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of some alleged factual dispute between the parties, however, will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 247–248, 106 S.Ct. 2505.

Applying these principles, the ample record of this case—comprising a paper trail some 16 years long, including one prior and one pending judicial proceeding, legislative and municipal enactments, extensive correspondence, documents, and detailed affidavits from a half-dozen of the major players—compels the conclusion that the defendants' motion for summary

judgment must be granted. The plaintiff has alleged violations of it rights under the Due Process, Equal Protection, Contract, and Takings Clauses of the Constitution, but has failed to raise any colorable issue that it is entitled to relief on the basis of any of these constitutional doctrines. The plaintiff has also raised a claim of equitable estoppel, which is equally unavailing. The claims are treated in turn.

### A. *Due Process*

CIR argues that the City has violated its property interest in the lease on the City-owned Steeplechase Park properties, which, though a creature of New York state law, is protected under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). CIR's account of the state law basis of its claim to a protected property interest shows that its claim of a due process violation is without merit.

As already noted, at oral argument CIR abandoned its theory that it was a party to a draft lease made valid and enforceable by its part performance thereunder, in favor of a new theory, also first broached at oral argument: that CIR fully performed under a contract to enter into a lease that is valid and enforceable on its face.[5] CIR's argument rests almost entirely on a somewhat tendentious view of the transactions between CIR and the City between May and September 1992. Specifically, CIR notes that in the last three extension letters from the City, dated May 22, June 25, and July 27 of 1992, there is no express mention of financing as a condition on the creation of a lease between CIR and the City. From this observation, CIR invites the Court to infer that financing had somehow fallen out of the contract between the parties, leaving CIR with only two performance obligations: to sign and deliver the draft lease, and to make all extension payments due under extension letters dating back to November 22, 1990.

This argument fails on both the facts, and the law. As to the facts, it begs the question: what was the mutually intended purpose of the extensions for which CIR was paying so handsomely? If, as of May 1992, the parties' understanding was that CIR had no performance obligations other than to sign and deliver the draft lease it had held since November, 1990, and to make all due extension payments, what conceivable end could signing yet another extension letter serve? The answer of course is plain on the record. As stated by Deputy Mayor Hernandez–Piñero in her November 25, 1991 letter to Mr. Bullard, the reason CIR needed the extensions in the first place was that it needed time to procure "financing ... in form and amount satisfactory to the City...." Brown Aff., Exh. D. In her affidavit of April 6, 1994, sworn to in support of the City's opposition to CIR's application for an order to show cause pursuant to Article 78, EDC Vice–President Angela Brown explained this rationale:

> Execution of the ground lease, however, was conditioned upon CIR securing firm financing for the construction and development of the proposed project. It was the intention of the parties that the developer could market the project to potential investors with a substantially completed draft lease in hand. A draft

---

5. In its papers, plaintiff argues that its payments to the City between December 1990 and September 1992, amounting to in excess of $148,000, sufficed as "part performance" under the draft lease. But the record makes clear, as plaintiff finally came to concede at oral argument, that these payments were made in consideration first, of extensions granted by the City of the original Board of Estimate deadline for execution and delivery of a ground lease; and second, of an extension granted for the purpose of allowing CIR to execute a joint venture agreement. Balder Supp. Reply Aff. at ¶ 10. In addition, $20,000 was paid as a penalty for failure to make timely repair to the Coney Island Pier, which failure led eventually to the revocation of CIR's license. *Id.;* Balder Reply Aff. on Cross–Mot. to Dismiss, Exh. A.

lease was prepared in order that CIR could further demonstrate to its potential financing sources that the City fully intended to provide CIR with a financeable leasehold interest in the property. Once CIR secured a firm commitment for financing, the parties could then make minor modifications to the draft ground lease to meet the requirements of the financing entity.

Brown Aff. at ¶ 25. There is not an iota of evidence in the capacious record before this Court to suggest that CIR ever secured "a firm commitment for financing," much less that such financial interest as it did generate was "in form and amount satisfactory to the City."[6] Though not for lack of trying, CIR simply failed to obtain the financing that was a condition precedent on the lease from the outset of and throughout its dealings with the City. That fact alone suffices to explain why the lease was never executed and delivered, why it cannot be deemed valid and enforceable today, and why therefore it is not a protected property interest under the Due Process Clause.

 New York contract law supports the same conclusion. Contracts are interpreted in light of all their surrounding circumstances and of the acts of the parties. *Archibald v. Panagoulopoulos*, 233 N.Y. 478, 488–89, 135 N.E. 857 (1922). Here the surrounding circumstances and the acts of the parties demonstrate that financing remained a condition precedent to execution and delivery of the lease throughout the entire negotiation process,

including the period covered by the final three extension letters. From the project's conception with the Board of Estimate Resolution in 1989, it was understood that the Mayor and his designees were vested with discretion to execute and deliver the lease under such terms and conditions as they deemed "necessary, appropriate or desirable." Brown Aff., Exh. B at 7. Foremost among the terms and conditions imposed under this authority was the requirement that CIR obtain "financing in form and amount satisfactory" to the Mayor or his designees. As the Brown Affidavit from 1994 attests, the City provided a draft lease to CIR in 1990, as an aid to the procurement of that financing. The circumstances make the City's intent clear. Having told CIR that no lease could be executed absent firm financial commitments, yet knowing that securing such commitments in the context of a real estate deal is difficult absent evidence of a contemplated underlying property interest, the City gave CIR a document that would show prospective financiers what that property interest *would look like* were they to make a firm commitment to the envisioned project. The strategy did not work. CIR was unable to elicit that firm commitment, even with the draft lease in hand, and notwithstanding the City's diligent assistance, in extending deadlines no fewer than five times. As a matter of law, the conclusion could not be plainer: even if, as CIR now maintains, the parties were contemplating a contract to enter a lease, a condition precedent to that contract was

6. Plaintiff states in conclusory fashion that it "did procure commitments for financing." Pl.Opp.Mem. of Law at ¶ 7. But the record shows that the "commitments" referred to were, at best, vague expressions of preliminary interest. The most substantial communication, a letter from Fuji Bank dated March 16, 1994, states a potential interest in "the contractually obligated income portion of the transaction," and refers to a need to solicit "bankable sponsorship commitments for entertainment facilities." Brown Aff., Exh. L. Another letter from Donaldson, Lufkin & Jenrette, which was acting as a placement agent for the amusement park project at the time,

expresses the hope that "sufficient financing" will soon be identified, "provided we can locate a participant/operator willing to proceed and operate the Park." Brown Aff., Exh. M. Even if this Court were to regard these letters as evidence of CIR's "commitments for financing," there would be no basis for regarding the City's assessment of them as arbitrary or capricious. The City, quite reasonably, remained "unconvinced that CIR has or will be able to procure a financing commitment from a potential source of construction and/or permanent loan financing any time soon." Brown Aff., Exh. O.

not satisfied. Consequently, there never was a contract. *See Kapson Constr. Corp. v. ARA Plumbing, & Heating Corp.*, 227 A.D.2d 484, 485, 642 N.Y.S.2d 701, 703 (2d Dep't 1996) ("Since the existence of the contract was premised on the satisfaction of a condition precedent, no contract arises 'unless and until the condition occurs'.") (quoting Calamari and Perillo, Contracts § 11–5, at 440 (3d ed)).

■ Even more to the point here are the words of Justice Cardozo, engraved on the memories of anyone who has taken first-year contract law:

> The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation.' imperfectly expressed....

*Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91, 118 N.E. 214 (1917). The words expressly recapitulating CIR's obligation to procure financing as a condition precedent to execution and delivery of the lease may have been missing from the last three extension letters, but it would be the very epitome of primitive formalism to infer from that omission that it had somehow "fallen out" as a term of the agreement between the parties. Of course, it had not; as noted, that is the reason CIR continued to seek additional extensions. Thus, when CIR finally failed to obtain the financing it sought, and the City terminated negotiations with it, the City was not breaching any obligation to CIR. A transaction that had been contemplated simply failed to come to fruition. CIR, understandably aggrieved, does not thereby have a claim of constitutional dimension.[7] Accordingly, its Due Process claim must be dismissed.

7. Indeed, even if CIR had established a breach of contract, it would still not have shown a deprivation of property, since the mere breach of a contractual right is not a

### B. Contract Clause

The Contract Clause provides:

■ No State shall ... pass any ... Law impairing the Obligation of Contracts.... U.S. Const., Art. I, § 10. The elements of a claim under the Contract Clause are well established: a contractual relationship; a change in law impairing that relationship; and, impairment that is substantial and unjustified. *General Motors Corp. v. Romein*, 503 U.S. 181, 185–86, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992).

■ Here, plaintiff fails to make even a prima facie showing under any of the elements. First, as has already been established, there was never a contractual relationship. There were negotiations undertaken in the mutual hope of entering into a contractual relationship. And second, two of the three "changes in law" on the record—the 1988 enactment of the New York State Legislature, and the Board of Estimate Resolution—were made to assist CIR in its attempts to execute a contractual relationship that, in fact, never materialized. The third change in law is the City Council Resolution of this year, approving the City's plans to construct a baseball stadium in Steeplechase Park, but of course, that action did not impair any contractual relationship, the mere prospect of which had long since been extinguished. Accordingly, plaintiff's Contract Clause claim must be dismissed.

### C. Takings Clause

■ The Takings Clause provides that "private property [shall not] be taken for public use without just compensation." U.S. Const., Amend. V. This prohibition is applicable to the conduct of the states and their municipal subdivisions through the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449

deprivation of property protected by due process. *S & D Maintenance Co. v. Goldin*, 844 F.2d 962, 970 (2d Cir.1988); *Waltentas v. Lipper*, 636 F.Supp. 331, 335 (S.D.N.Y.1986).

U.S. 155, 160, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980).

 Plaintiff raises no claim of physical occupation of its own property, so its takings claim is of the "regulatory" variety, and must rest on a showing of "legal interference with the physical use, possession or enjoyment of property or a legal interference with owner's power of disposition of the property." *City of Buffalo v. J.W. Clement Co.*, 28 N.Y.2d 241, 255, 321 N.Y.S.2d 345, 269 N.E.2d 895 (1971). Plaintiff contends that its parcels contiguous to the City-owned Steeplechase Park parcel have been rendered useless by the baseball stadium proposal, because the contiguous parcels are zoned exclusively for "amusement park and amusement park related uses." Bullard Aff. of June 12, 2000 at ¶ 15. Leaving aside whether this representation is accurate, it still falls well short of making out a regulatory takings claim. A regulatory takings claim is not ripe until the government "entity charged with implementing the regulations has reached final decision regarding the application of the regulations to the property at issue." *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). CIR has not alleged that it has sought a new zoning designation of its contiguous parcels, assuming one is necessary. For its part, the City has made several verbal representations to this Court of its willingness in principle to work with landowners contiguous with development projects on City-owned property; the impression left is that it would be willing to work with CIR in conjunction with the proposed baseball stadium. Certainly there is no evidence to suggest that the City is impeding or has impeded any CIR initiative to develop the contiguous property in a way that would somehow complement the stadium project. It follows that CIR's takings claim must be dismissed.

### D. *Equal Protection*

 Plaintiff's President, Mr. Bullard, alleges that the reason the City terminated negotiations with him is that he is African American, and Mayor Giuliani was animated by hostility towards him as an African American. Bullard Opp. Aff. at ¶ 17.[8] CIR claims that certain remarks by former EDC President Charles Millard support these charges. CIR claims that these allegations support a claim that its

---

**8.** Mr. Bullard makes this allegation in the course of asserting that CIR intends to move to amend its Complaint. Bullard Opp. Aff. at ¶¶ 17–21. Although no such motion was actually made, even if it had been, it would have to be denied. Under Rule 15(a), leave to amend should be freely given in the absence of countervailing factors such as undue delay, bad faith, undue prejudice to the opposing party, or futility of the amendment. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). An amendment would be futile if it could not survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Bldg. 1 Hous. Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir.1979). In considering whether plaintiff's proposed amended complaint is futile, the Court should construe the proposed amended complaint in the light most favorable to plaintiff, *Gabourel v. Bouchard Transp. Co.*, 901 F.Supp. 142, 144 (S.D.N.Y.1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)), and leave to amend should only be denied if plaintiff can prove no set of facts which would entitle her to relief. *Id.* (citing *Dahlberg v. Becker*, 748 F.2d 85, 88 (2d Cir. 1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985)). Here, plaintiff would move to amend its complaint to state causes of action for monetary damages, a takings claim, a Contract Clause claim, and an equal protection claim. Because they were raised at least obliquely in plaintiff's papers and in oral argument, the three latter constitutional claims are disposed of herein, so amendment to state them as causes of action would be futile. As to the damages claim, it too is foreclosed, because, for reasons already stated, CIR never had an enforceable contract with the City or any of its agencies or designees. Accordingly, deeming that the plaintiff has moved to amend its complaint, the Court is compelled to deny that motion.

right to equal protection under the Fourteenth Amendment has been violated.

■■■ An equal protection claim requires proof that the plaintiff, compared with others similarly situated, was selectively treated on the basis of impermissible considerations, such as race. *Crowley v. Courville*, 76 F.3d 47, 52–53 (2d Cir.1996). As already noted in this Court's Memorandum and Order of May 10, 2000, plaintiff has failed to adduce any evidence showing how, compared with others similarly situated, either CIR or Mr. Bullard was selectively treated. He has also failed to show that anything about the City's treatment of either CIR or Mr. Bullard was based on impermissible considerations. Mr. Bullard makes much of an alleged statement by EDC's Millard, made in October, 1998, to the effect that the Mayor's action in removing the Steeplechase Park amusement park from EDC was "unprecedented." Bullard Opp. Aff. at ¶ 11; Scheffer Aff. at ¶ 16. Mr. Bullard also points to a meeting held in late 1997 between Millard and one of CIR's representatives, in which the amusement park project was discussed and Millard made no mention of the baseball stadium proposal. Scheffer Aff. at ¶ 3. On their face, these incidents are manifestly insufficient to raise even a colorable equal protection claim. It follows that CIR's allegation of an equal protection violation must be dismissed.

### E. *Estoppel*

Finally, plaintiff asserts that the City should be estopped, under principles of equitable estoppel, from "denying that they were negotiating with the Plaintiff in bad faith." Pl.Mem. of Law at ¶ 10. Plaintiff asserts that it incurred significant expenditures in the course of trying to bring the transactions here at issue to a close, thereby relying to its detriment on representations by the City made in the course of years of negotiation.

■■■ The law requires more than a showing of detrimental reliance on materi-al representations by a plaintiff looking to invoke equitable estoppel against a government or government agency. *Petrelli v. City of Mount Vernon,* 9 F.3d 250, 256 (2d Cir.1993). Because an estoppel against the government implicates the "interest of the citizenry as a whole," *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 61, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), such an estoppel must be supported by proof that the government's conduct was willful, wanton, or reckless. *FHM Constructors, Inc. v. Village of Canton Housing, Authority,* 779 F.Supp. 677, 682 (N.D.N.Y.1992). It follows that equitable estoppel against the government is foreclosed "in all but the rarest of cases." *New York State Medical Transporters Assoc. v. Perales,* 77 N.Y.2d 126, 130, 564 N.Y.S.2d 1007, 566 N.E.2d 134 (1990) (citation and internal quotation marks omitted).

■■■ This is not one of those "rarest of cases." No doubt plaintiff did spend a good deal of money in the hope that the amusement park project would succeed. It did not, but the reason lies not in the City's wantonness or recklessness; the reason lies in CIR's failure to obtain the required financing. Accordingly, an estoppel does not lie, and plaintiff's claim to an estoppel must be dismissed.

### CONCLUSION

For the reasons stated, the defendants' motion for summary judgment is granted in its entirety, and Complaint is dismissed.

SO ORDERED.